**Charles William CATON, Appellant,**

**v.**

**UNITED STATES of America,**
**Appellee.**

**No. 18965.**

United States Court of Appeals
*Eighth Circuit.*

Feb. 19, 1969.

Rehearing Denied March 24, 1969.

Certiorari Denied June 23, 1969.
See 89 S.Ct. 2149.

Irl B. Baris, of Newmark & Baris, St. Louis, Mo., for appellant.

Daniel R. O'Neill, Asst. U. S. Atty., St. Louis, Mo., for appellee; Veryl L. Riddle, U. S. Atty., on the brief.

Before VAN OOSTERHOUT, Chief Judge, and MEHAFFY and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

Charles Caton, Julian Andreu and James Andreu were charged on a one count indictment with burglary of the Bank of St. Peters, Missouri, in violation of 18 U.S.C. § 2113(a). The charges against James Andreu were dismissed on the morning of trial and he became the principal witness for the gov-ernment. Charles Caton and Julian Andreu were convicted and sentenced to eight and twelve years respectively. Caton appeals his conviction. We affirm.

The defendant, Caton, contends that the District Court erred: (1) in denying the defendant's motion for dismissal at the close of the government's case; (2) in denying the defendant's motions for severance and a separate trial; (3) in permitting an agent of the Federal Bureau of Investigation to testify as to a conversation between the defendant and Julian Andreu; (4) in instructing the jury that no inference should be drawn from the failure of an accused to testify; and (5) in denying the defendant's pretrial motion that the indictment against him be dismissed on the grounds that his transfer from state to federal jurisdiction denied him due process of law.

## THE MOTION TO DISMISS

The defendant contends that his motion to dismiss should have been granted because: (1) the testimony of the chief government witness, James Andreu, was inherently unbelievable, and (2) even if believable, was not sufficient when considered with other relevant evidence to justify submitting the issue of the defendant's guilt to the jury. We disagree.

### James Andreu's Testimony

The defendant, Julian Andreu, and James Andreu (brother of Julian) left Jacksonville, Florida, for the St. Louis, Missouri, area on March 31, 1966, in Julian's automobile. James drove as neither the defendant nor Julian had a driver's license. Julian agreed to pay James $150.00. James did not know why the defendant and Julian wanted to go to St. Louis.

Prior to departing, Julian asked James to rent acetylene tanks and torches. James did so and they were taken along with them. The equipment was in the car when James was arrested. James

did not know why Julian wanted the tanks.

On the way to St. Louis, a stop was made at a Western Auto Store. All three men went into the store. Julian purchased several items, including a hack saw which James saw protruding from a sack in which the purchases had been placed. The defendant was looking at fishing rods when Julian made his purchases.

They arrived in the St. Louis area late on Saturday, April 1, 1967, and checked into a single room at the Ben Franklin Motel in Bridgeton, Missouri.

On Sunday afternoon, April 2, 1967, all three men drove to St. Peters, Missouri. They drove up the main street, turned around and returned to the motel. That evening, James drove the defendant and Julian to a railroad overpass near the Bank of St. Peters. Julian and the defendant got out of the car. They told him to leave but to return to the overpass at 10:00 P.M., 11:00 P.M. and 12:00 P.M. and pick them up. He did not know why they went to St. Peters or what they intended to do.

James saw a black bag in the car when they left the motel, but he did not see it in the car after the defendant and Julian got out. He also observed that the defendant was wearing a red shirt.

James followed his instructions and returned at 10:00 P.M., 11:00 P.M. and 12:00 P.M. Neither the defendant nor Julian appeared. James was arrested when he returned to the motel shortly after 12:00 P.M.

James gave a pretrial statement to agents of the Federal Bureau of Investigation (F.B.I.) which conflicted in numerous respects with the testimony he gave at trial. He stated on cross-examination that he had lied to the agents.

### Other Testimony and Evidence

At about 11:12 P.M., a deputy sheriff heard the Bank of St. Peters' burglar alarm sounding. An investigation of the premises disclosed that a basement window had been forced open and that an attempt had been made to knock a hole in the bank's vault. A pair of glasses and two pairs of shoes were found near the forced window. A black bag containing a hack saw, tools, two pistols and a pair of men's shoes was found near the vault. A pry bar, a wooden night stick, a pair of pliers and a small button with threads attached were also found.

Some of the tools bore the "Wizard" trademark of the Western Auto Company. The frames and lenses of the eye glasses matched Julian's prescription. The threads and button were of the same type as those of Julian's shirt. Julian's shirt was missing three buttons when it was taken from him after his arrest. Debris found in the pocket of Julian's shirt matched the debris found in the bank.

A man wearing a red "sweater" was observed approaching the motel about four o'clock in the morning of April 3rd, and knocking on the door of the motel room rented to the defendants. One of the officers approached and the man fled. About 4:30 A.M., another officer spotlighted a man hiding in the bushes. The man threw down a red pullover shirt and fled. The officer gave chase and fired two shots. At about 6:00 A.M., officers found the defendant lying on the ground in a garage, covered by a blanket, in the direction that the suspect fled. He was wearing a T-shirt, slacks and shoes without socks. He was arrested.

Julian Andreu was arrested shortly after four o'clock when he was discovlying under a parked car at the motel. He was wearing a shirt and pants but no socks or shoes. He was not wearing glasses.

An F.B.I. agent, present in a car transporting the defendant and Julian Andreu to the United States Marshal's Office in St. Louis, overheard the defendant tell Julian: "They were popping at me in the weeds;" and Julian replied: "I was following it over the radio."

### The Believability of James Andreu's Testimony

The defendant contends that James' testimony was inherently unbelievable because: it was that of an accomplice; it was given in consideration of the government dismissing the indictment against him on the morning of trial; it conflicted with his earlier statement to the F.B.I.; and it was improbable in that James purported to be ignorant of the unlawful intentions of his brother, Julian, and the defendant. We do not agree.

The court carefully instructed the jury as to the weight to be given to the testimony of an accomplice. See, Foston v. United States, 389 F.2d 86, 89 (8th Cir. 1968).

The testimony of an accomplice is not necessarily incredible because he expects or hopes to receive a lessened penalty or dismissal of the charges against him for turning state's evidence. See, Lisenba v. California, 314 U.S. 219, 227, 62 S.Ct. 280, 86 L.Ed. 166 (1941); Suhl v. United States, 390 F.2d 547, 550–551 (9 Cir.), cert. denied, 391 U.S. 964, 88 S.Ct. 2035, 20 L.Ed.2d 879 (1968); Minkin v. United States, 383 F.2d 427 (3rd Cir. 1967).

James' testimony did conflict with his earlier statement to the F.B.I., but he was vigorously cross-examined on the points of differences by the defendant's counsel. See, Suhl v. United States, supra; Brown v. United States, 126 U.S.App.D.C. 134, 375 F.2d 310, cert. denied, 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967).

Finally, we do not believe that James' testimony was, as a matter of law, so improbable that the trial court should have instructed the jury to disregard it. While it is difficult to believe that James was no more than an innocent bystander, his testimony as to the actions of the defendant from the time he left Florida until he was dropped at the overpass in St. Peters, Missouri, is substantiated by other evidence. It is unnecessary for us to speculate whether the jury might also have found that James Andreu was as guilty as his brother, Julian, and the defendant.

### The Sufficiency of the Evidence

In determining whether the evidence was sufficient to make a submissible case, we view the evidence in the light most favorable to the prevailing party. All reasonable inferences supporting the trial court's determination must be accepted as established. Cave v. United States, 390 F.2d 58 (8th Cir.), cert. denied, 392 U.S. 906, 88 S.Ct. 2059, 20 L.Ed.2d 1365 (1968); Coon v. United States, 360 F.2d 550 (8th Cir.), cert. denied, 385 U.S. 873, 87 S.Ct. 145, 17 L. Ed.2d 100 (1966).

The defendant and Julian were both charged with entering a bank with the intent to steal therefrom and commit larceny therein. The jury was properly instructed by the court that one who aids and abets another in the commission of a crime is punishable as a principal. Thus, it was not necessary for the government to prove that both defendants entered the bank. It was sufficient to prove that one entered the bank with the requisite intent and the other aided and abetted the entry.

The evidence clearly and convincingly establishes that Julian Andreu was guilty of the crime charged. The eye glasses, "Wizard" brand tools, button and threads and debris found in Julian's shirt all place Julian inside the bank.

The evidence connecting the defendant to the crime, while less conclusive, was nevertheless sufficient to justify submitting the case to the jury. The defendant traveled from Jacksonville, Florida, to St. Louis, Missouri, with Julian. The acetylene tanks which Julian had James rent were taken with them. The defendant was in the store when Julian purchased the tools. They checked into the same motel room. They cased the bank together. They were dropped off near the bank together in the evening. One of them took the black bag out of

the car. They instructed James to pick them up at the same place; neither appeared. The defendant was wearing a red shirt. A man wearing a red shirt attempted to enter the motel room at 4:00 A.M. but fled when approached by an officer. Julian was arrested shortly after 4:00 A.M. in the motel parking lot when he was found hiding under a car. An officer spotted a man hiding in the bushes at 4:30 A.M. He threw down a red shirt and fled. The officer fired several shots at him. An agent overheard the defendant say that the shots were fired at him. The defendant was found hiding in a garage at about 6:00 A.M. He was wearing a white T-shirt.

### SEVERANCE

The defendant asserts that the trial court erred in denying the defendant's timely motions for severance because: (1) it was probable that evidence admissible against Julian would not be admissible against the defendant; (2) communication and cooperation between the defendants' counsel would be impossible as the defendant might have to defend against a co-defendant's, James Andreu, testimony; and (3) the defendant would be confined at trial and his co-defendant would not.

■ (1) The fact that evidence may be admissible as to one defendant but not to the other does not require that the defendants be given separate trials. Rizzo v. United States, 304 F.2d 810 (8th Cir.), cert. denied, Nafie v. United States, 371 U.S. 890, 83 S.Ct. 188, 9 L. Ed.2d 123 (1962). Rule 8(b) of the Federal Rules of Criminal Procedure anticipates that evidence may be admissible against one defendant but not necessarily against another. Haggard v. United States, 369 F.2d 968, 973 (8th Cir. 1966), cert. denied, Alley v. United States, 386 U.S. 1023, 87 S.Ct. 1379, 18 L.Ed.2d 461 (1967).

■■ Severance is usually addressed to the discretion of the trial judge, but see, Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968),

and his denial is not subject to reversal unless clear prejudice is shown. Johnson v. United States, 356 F.2d 680, 682 (8th Cir.), cert. denied, 385 U.S. 857, 87 S.Ct. 105, 17 L.Ed.2d 84 (1966). It has not been shown here.

The defendant argues that Bruton v. United States, supra, requires severance in any case where evidence of substantial importance is admissible against one defendant but not against another. The holding in *Bruton* is not that broad. The Court, in Roberts v. Russell, 392 U.S. 293, 294, 88 S.Ct. 1921, 20 L. Ed.2d 1100 (1968), set forth its holding in *Bruton* in the following language:

" * * * that despite instructions to the jury to disregard the implicating statements in determining the codefendant's guilt or innocence, admission at a joint trial of a defendant's extrajudicial confession implicating a codefendant violated the codefendant's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment. * * *

* * * * * *

" '[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. . . . Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant . . . are deliberately spread before the jury in a joint trial.' * * * [Bruton v. United States, 391 U.S. 123, 135–136, 88 S.Ct. 1620."

The Court noted in *Bruton* that in many cases, " * * * [I]t is not unreasonable to conclude that * * * the jury can and will follow the trial judge's instructions to disregard such information. * * * ". Bruton v. United States, *supra* at 135, 88 S.Ct. at 1627. This is such a case.

■ (2) We find no merit in the defendant's argument that lack of cooperation between defense counsel preju-

diced the defendant. There is no evidence in the record suggesting that the defendant was prejudiced by the fact that he was not positive that James would testify. In fact, the defendant suggests that knowing there was a possibility that James would testify, he did not cooperate and communicate with James' counsel.

The defendant also suggests that the trial court should have granted severance during trial because of the different trial tactics. Neither the defendant nor Julian introduced any evidence or testified at trial. Both counsel confined their efforts to cross-examination. The defendant complains that Julian's counsel frequently objected and this prejudiced him in the eyes of the jury. While there were frequent objections by Julian's counsel, we cannot say that they were so numerous or ill founded as to prejudice either Julian or the defendant. " * * * It is not enough simply to show that such joinder makes it more difficult to defend. * * *". Johnson v. United States, *supra*, 356 F.2d at 682.

▆▆ (3) The defendant contends that he was entitled to a separate trial because he was confined and in the custody of the United States Marshal while Julian was not. He asserts that this fact would not go unnoticed by the jury and the jury's comparison would be to his prejudice. The government contends that the defendant's conduct warranted the confinement and had the same reasons been present, he would have been confined at a separate trial. Neither the government nor the defendant have enlightened us on the reason for the defendant's confinement. The defendant concedes that his assertion is speculative. We cannot find prejudice on such a tenuous base. *Cf.,* Loux v. United States, 389 F.2d 911, 919–920 (9th Cir. 1968), cert. denied, 393 U.S. 867, 89 S.Ct. 151, 21 L.Ed.2d 135 (Oct. 14, 1968).

In sum, the defendant's objections neither individually nor in total demonstrate that there was such an abuse of discretion by the trial court as to demand reversal.

## INCRIMINATING CONVERSATION

An F.B.I. agent testified that he was present in a car transporting the defendant and Julian from Bridgeton to St. Louis and overheard the defendant tell Julian: "They were popping at me in the weeds;" and Julian replied: "I was following it over the radio."

Prior to this incident, another agent had given the defendant an oral and a written Miranda warning. The defendant read but declined to sign the latter. The defendant stated that he did not want to discuss his activities without an attorney present and the agent terminated the interview.

The defendant contends that the court erred in admitting testimony as to the conversation between himself and Julian on the following grounds: (1) he was not adequately warned of his rights; (2) the conversation took place in the absence of counsel; (3) the government agent overheard the conversation only because he invaded the defendant's constitutional right to privacy; and (4) the court did not submit the issue of the voluntariness of the conversation to the jury.

(1) *Sufficiency of the Warning.*

▆▆ The defendant contends that the warning was insufficient as it did not include a specific statement that conversations with persons other than law enforcement officials could also be used against him. This contention is without merit. The oral and written warnings given followed those laid down in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in letter and spirit.

(2) *Absence of Counsel.*

▆▆ The defendant contends that as he requested counsel, the government was precluded from introducing statements by him in the absence of one.

The defendant relies on White v. Hancock, 378 F.2d 479 (1st Cir. 1967).

The Court there held that Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), precludes the admission of post-indictment statements, whether or not voluntary, made in the absence of counsel.

We find the defendant's reliance misplaced. While we express no opinion as to the sweep of the *Massiah* case, it is clearly inapplicable to our situation. The significant factor in *White* and *Massiah* was that the statements were made after the defendant had been indicted. Here, the defendant had been arrested but he had not been indicted.

The defendant had been fully informed of his rights. The statement was not elicited through trickery, misrepresentation or coercion. It was not even the product of an interrogation. " * * * Volunteered statements of any kind are not barred by the Fifth Amendment * * *." Miranda v. Arizona, *supra*, 384 U.S. at 478, 86 S.Ct. at 1630.

#### (3) *Right to Privacy.*

 The defendant contends that the F.B.I. agent invaded his constitutional right to privacy. He argues that when he made it clear that he did not want to discuss the case, the government should have respected his right to privacy by not listening.

The defendant analogizes his situation to that involved in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In Katz, the government surreptitiously monitored, without judicial authorization, an incriminating phone conversation which the defendant placed from a public phone booth. The Court held the conversation inadmissible as it violated the defendant's right to privacy under the Fourth Amendment.

We do not think that *Katz* is applicable here. We are not faced with a situation where the government has furtively eavesdropped on a conversation and the participants are unaware of the government's "uninvited" ear. The agent was sitting in the front seat and the defendant was in the back seat of the car.

While the defendant may not have intended the agent to overhear, he must have realized that if he spoke loudly enough, the agent was bound to hear.

#### (4) *Voluntariness of the Statement.*

 The defendant lastly contends that the statement was improperly admitted because there was no instruction to the jury on the issue of voluntariness. The defendant's position is without merit.

Jackson v. Denno, 378 U.S. 368, 84 S. Ct. 1774, 12 L.Ed.2d 908 (1964), does not require the trial court to submit the question of voluntariness to the jury where, as here, the trial court has itself ruled that the statements were voluntary. United States v. Anderson, 394 F.2d 743, 747 (2d Cir. 1968); Tucker v. United States, 375 F.2d 363 (8th Cir.), cert. denied, 389 U.S. 888, 88 S.Ct. 128, 19 L.Ed.2d 189 (1967).

### JURY INSTRUCTION

Julian Andreu requested the trial court to instruct the jury on *his* failure to testify. The defendant opposed giving any instruction relating to the failure of either defendant to testify. The trial court denied Julian's request but instructed the jury as follows:

"A defendant is not required under the law to take the witness stand. He cannot be compelled to testify at all, and if he fails to do so no inference unfavorable to him may be drawn from that fact."

The defendant contends that giving the instruction over his objection was reversible error. He argues that the instruction, in effect, constituted an unrequested comment upon his failure to testify.

We do not agree. In the light of Julian's request, the trial court had no alternative but to give the instruction. Bruno v. United States, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939); United States v. Kelly, 349 F.2d 720, 768–769 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544

(1966); Smith v. United States, 72 App. D.C. 187, 112 F.2d 217, cert. denied, 311 U.S. 663, 61 S.Ct. 20, 85 L.Ed. 425 (1940). He was obligated to do so despite the defendant's objection. United States v. Kelly, *supra*, 349 F.2d at 769.

The defendant's suggestion that *Bruno* is of doubtful validity since Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), is without merit. It is clear that *Griffin* intended only to leave open the question of the applicability of *Bruno* to the states.

We recognize that dicta of this Court in Schuermann v. United States, 174 F. 2d 397, 401 (8th Cir. 1949), citing Wilson v. United States, 149 U.S. 60, 13 S. Ct. 765, 37 L.Ed. 650 (1893), suggests a contrary result:

" * * * [U]nless the defendant chose to have * * * [the disputed] instruction given, the giving of it would be of doubtful propriety, since it would call the jury's attention to the defendant's failure to testify. * * * "

We note, however, that *Wilson* and *Schuermann* preceded *Bruno* and are distinguishable on their facts. *Wilson* dealt specifically with a hostile comment by the prosecutor as to the failure of an accused to testify and came on the heels of a change in the common law rule.[1] Schuermann was the sole defendant in the case bearing his name.

We adhere to the view expressed in *Schuermann* that a trial court ought, in the exercise of its discretion, to permit a defendant being tried alone to insist that the disputed instruction not be given. However, we hold that where two or more defendants are being properly tried, it is not, in the absence of special circumstances, prejudicial error for a trial court to give the disputed

---

1. In Wilson v. United States, 149 U.S. 60, 13 S.Ct. 765 (1893), Mr. Justice Field held that it was error to comment on the failure of an accused to testify. The decision was based on the Act of Congress of March 16, 1878 (20 Stat. 30) which provided that a criminal defendant could testify in his own behalf but charged that his failure to testify should not create a presumption against him. Mr. Justice Field reasoned that the only way to effectuate the Congressional purpose was to prevent any comment on the failure to testify. Mr. Justice Field went on to state:

"At common law no one accused of a crime could be compelled to give evidence in a prosecution against himself, nor was he permitted to testify in his own behalf. The accused might rely upon the presumption of the law that he was innocent of the charge, and leave the government to establish his guilt in the best way it could.

"This rule, while affording great protection to the accused against unfounded accusation, in many cases deprived him from explaining circumstances tending to create conclusions of his guilt which he could readily have removed if permitted to testify. To relieve him from this embarrassment the law was passed. [The Act of Congress of March 15, 1878 (20 Stat. at L. 30, chap. 37).] In mercy to him, he is by the act in

question permitted, upon his request, to testify in his own behalf in the case. * * * "

Wilson v. United States, *supra* at 65–66, 13 S.Ct. at 766.

Implicit in Mr. Justice Field's reasoning is the conclusion that without comment on the accused's right to testify, a jury, because of the common law rule, then only recently changed, would presume that a defendant was *not* permitted to testify. It would thus attach little significance to his failure to do so.

The reverse is perhaps true today. Most jurors are well aware of an accused's right to testify in his own behalf. Experience, however, has indicated that jurors tend to be suspicious of those who do not testify (See, 8 Wigmore, Evidence § 2272 (McNaughton rev. 1961)); thus, in Bruno v. United States, 308 U.S. 287, 292, 60 S.Ct. 198, 200 (1939), the Court recognized the propriety of giving the instructions which admonished the jury that it should not presume guilt from silence:

"The only way Congress could provide that abstention from testifying should not tell against an accused was by an implied direction to judges to exercise their traditional duty in guiding the jury by indicating the considerations relevant to the latter's verdict on the facts."

instruction if it is requested by one or more of the defendants.

## TRANSFER TO FEDERAL AUTHORITIES

We turn now to the defendant's contention that he was deprived of due process of law by the alleged "arbitrary" transfer by the county sheriff of his person to the jurisdiction of the federal authorities without a judicial hearing to determine the proper forum. He argues that under Missouri law, he has numerous rights which are not available under federal law and the transfer arbitrarily deprived him of those rights to his prejudice in violation of due process of law clause of the Fifth Amendment. The defendant candidly admits that he has found no authority for his contention one way or another.

We find no merit in the argument. The short answer to the defendant's contention is that he could be tried by both sovereignties. Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). The defendant has no right to a hearing to determine which, if either, shall try him first.

Affirmed.