**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Frank E. JONES, James R. Jamerson, and Richard Eugene Webber, Defendants-Appellants.**

**Nos. 82–1458, 82–1464 and 82–1474.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 7, 1983.

Decided Aug. 9, 1983.

Certiorari Denied Nov. 14, 1983.

See 104 S.Ct. 434.

---

Francis J. Burke, Jr., Kenneth R. Parker, Asst. U.S. Attys., Stephen L. Day, Sp. Asst. U.S. Atty., Seattle, Wash., for plaintiff-appellee.

Stephen K. Strong, David Allen, Allen R. Bentley, Asst. Federal Public Defender, Seattle, Wash., for defendants-appellants.

Before WRIGHT, CHOY and NELSON, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

This case presents several issues. Foremost among them is whether defendants' sale/leaseback transactions were "securities" within the meaning of the securities fraud statute, 15 U.S.C. § 77q. We hold that they were and affirm the convictions on all counts.

## FACTS

In 1976, Jones brought Jamerson into Evergreen Investors, a trucking brokerage company that was experiencing financial difficulties. To alleviate Evergreen's difficulties, Jones and Jamerson joined several smaller investors in purchasing Krimbel Trucking, a company hauling loads between Washington and California.

Jamerson became Krimbel's president and Jones its vice-president. Jones handled the financial arrangements for the company while Jamerson, who had been a truck driver and owner of his own trucking company, assumed responsibility for Krimbel's day-to-day operations.

*Misapplication of Funds*

Early in 1977, Jones and Jamerson began to draw checks on Krimbel's account to pay obligations of Evergreen. They made payments from Krimbel's account on Evergreen's commercial loans and extended to it "interest-free" loans.

Later in 1977, Webber joined Jones and Jamerson in depleting Krimbel's assets. The defendants used Krimbel Trucking to haul cedar shakes for companies owned by Jones, Jamerson, and Webber. Krimbel extended credit to those companies and never received payment for the loads it hauled. After replacing Jamerson as Krimbel's president, Webber joined Jones in drawing Krimbel checks for improper purposes, including a payment on his personal mortgage.

*Sale/Leaseback Transactions*

Although Krimbel was operating at a loss during 1977, Jones approached prospective investors. He told them that Krimbel was undergoing great expansion and was about to secure a lucrative paper-hauling contract.

Jones convinced many to participate in investments involving tractors and trailers. He presented to potential investors a "package" that allowed them to buy equipment from Evergreen and lease it back to Krimbel. Jones assured investors that they were paying a fair price for the equipment and that Krimbel needed the equipment because of its unprecedented expansion.

Under the terms of the package, investors made low down payments for the trailers and financed the balance through bank loans, usually from the Commercial Bank of Seattle. Krimbel then made the monthly payments on its lease obligations to the bank, which applied part of the payment to the investors' loan balances and deposited the remainder to their accounts.

The package was attractive to investors because Krimbel's monthly lease payments

exceeded the investors' obligations on the bank loans. In addition, the package gave Krimbel a purchase option at the end of the lease, which would increase investors' return if exercised. To investors, the success of the sale/leaseback transactions depended on Krimbel's ability to make monthly payments and its exercise of the purchase option.

Jones collected a substantial commission on each trailer sale and misrepresented Evergreen's purchase price of the trailers, concealing a substantial markup. Although Jones and Jamerson assured investors that Krimbel was growing rapidly, its increase in business did not require that it lease as many trailers as it did.

Because of its operating losses and depletion of funds, Krimbel could meet its lease obligations on the trailers only by raising additional capital. Jones and Jamerson executed additional sale/leaseback transactions and, in the late summer of 1977, sold stock in Krimbel to existing shareholders and new investors. Jones and Jamerson did not disclose Krimbel's weak financial position or the terms of their original purchase of Krimbel.

In October of that year, Krimbel began to default on its lease payments to Commercial Bank. Soon thereafter, several truckers who were creditors of Krimbel forced it into bankruptcy. Although some investors recovered the trailers they had leased to Krimbel, they discovered that resale of the equipment did not cover the remaining loan balances. They experienced substantial losses on the sale/leaseback transactions and those who bought stock found it was worthless.

An Interstate Commerce Commission investigation of Krimbel's bankruptcy led to the indictment of the three defendants for misapplication of funds. After uncovering additional facts, the government sought and received a superseding indictment that included securities and mail fraud charges against Jones and Jamerson.

Jones and Jamerson were convicted of mail fraud and securities fraud in connection with the sale/leaseback transactions and the purchase of Krimbel. Either separately or together, all three defendants were convicted on most of the misapplication of funds charges. The jury convicted them of conspiracy and found Webber guilty of bankruptcy fraud, a conviction he has not challenged on appeal.

## SUFFICIENCY OF THE EVIDENCE

Jamerson and Jones challenge the sufficiency of the evidence of mail and securities fraud. They contend that the mailings were not sufficiently connected to the fraudulent scheme to establish the elements of either crime.

### Mail Fraud

In Counts 1 through 9, the government relied on bank mailings to charge Jamerson and Jones with mail fraud under 18 U.S.C. § 1341. As part of the sale/leaseback transactions, Commercial Bank (or in some cases another bank) mailed notices of lease payments to investors upon receipt of monthly payments from Krimbel.

Jamerson and Jones contend that the notices of lease payments were "routine business mailings" that cannot constitute mail fraud. They note that the bank sent the notices, that the information in the mailings was entirely truthful, and that the mailings were made long after the fraudulent sale/leaseback transactions were executed.

■ It is of no consequence that defendants did not mail the notices. The Supreme Court held long ago that one "causes" a mailing for purposes of 18 U.S.C. § 1341 if one acts with the knowledge that the use of the mails will follow in the ordinary course of business. *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954). When defendants caused Krimbel Trucking to make payments for unnecessary trailer leases, they knew that the banks would use the mail to notify investors of the payments.

■ Nor does it aid defendants that the notices of lease payments were truthful or were mailed after the agreements were signed. The mailings here follow the classic pattern of a "lulling" scheme, first rec-

ognized by the Supreme Court in *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). In such a scheme, the mailing reassures the victim that all is well, discouraging him from investigating and uncovering the fraud. *Id.* at 80–81, 83 S.Ct. at 175–76.

Several investors testified that they relied on the mailings as demonstrating that Krimbel was doing well and that they had made a good investment. Indeed, when the mailings stopped, at least one investor called authorities, which prompted further investigation into Krimbel's affairs.

Defendants' reliance on *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), is misplaced. There the defendant stole a credit card and used it to charge items in several states. Although the merchants who accepted the card mailed invoices to the credit card company to allow billing of the party named on the card, the Court ruled that those mailings were of no interest to the defendant and did not further the fraud. *Id.* at 402, 94 S.Ct. at 649.

*Maze* distinguished *Sampson* but did not overrule it. *Id.* at 403, 94 S.Ct. at 650; *see United States v. Love,* 535 F.2d 1152, 1159 (9th Cir.), *cert. denied,* 429 U.S. 847, 97 S.Ct. 130, 50 L.Ed.2d 119 (1976). Unlike the defendant in *Maze,* the defendants here had an interest in the bank mailings which lulled investors into complacency regarding Krimbel. The mailings furthered the fraud and we affirm the convictions on these counts.

Defendants have raised no arguments bearing on the mail fraud convictions in Counts 10, 11, and 12. These mailings contained fraudulently obtained guarantees and false statements regarding the purchase prices of trailers. Obviously they furthered the fraudulent scheme, and we affirm the convictions on these counts as well.

*Securities Fraud*

Use of the mails is one basis for federal jurisdiction over securities fraud. *See United States v. Brown,* 555 F.2d 336, 340 (2d Cir.1977). The government relied on the notices of lease payments mailed by Commercial Bank to obtain jurisdiction over the securities fraud charges in counts 13 and 14. The government argues that the sale/leaseback transactions were themselves securities and that the use of the mails was directly connected to the fraud surrounding the sale/leaseback arrangements.

We have not considered previously whether sale/leaseback transactions can constitute securities, nor have we found helpful decisions from other circuits. The leading case for determining whether an investment is a security is *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The Court there explained that a security is distinguished by three elements: (1) an investment of money (2) in a common enterprise (3) with profits to come solely from the efforts of others. *Id.* at 301, 66 S.Ct. at 1104; *accord, United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975).

Jamerson and Jones argue that the common enterprise element is lacking from the sale/leaseback transactions. They point out that each sale/leaseback agreement was separate and that the trailers were not always leased back to Krimbel Trucking.

This circuit requires that a common enterprise be established by showing vertical commonality between the promoter and the investor. Funds of investors need not be pooled. *Mordaunt v. Incomco,* 686 F.2d 815, 817 (9th Cir.1982). Because the proof shows that the fortunes of the investors were linked with those of Jones, Jamerson, and Krimbel as promoters, the requisite commonality has been established. *See El Khadem v. Equity Securities Corp.,* 494 F.2d 1224, 1229 (9th Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974).

The other elements of the *Howey* test were present. Although the investors were the nominal owners of the trailers, several testified that they had no interest in owning trailers or tractors and considered them an investment. They expected their

profits to come from the "efforts of others," here Krimbel Trucking.

■ They believed that Krimbel would continue as a profitable enterprise and make its lease payments. They anticipated also that Krimbel would exercise its option to purchase the trailers at the end of the lease term, completing the profit expectations outlined by Jones when he presented the sale/leaseback packages. We have held that the expectation of profits from the efforts of others is satisfied by an expectation that the promoter will repurchase the object of the investment at a later date. *See Smith v. Gross,* 604 F.2d 639, 642–43 (9th Cir.1979) (plaintiffs expected profits to come from defendant's commitment to purchase mature earthworms).

■ Having established that the sale/leaseback transactions were securities, we have no doubt that the mailings of notices of lease payments sufficed to give the court jurisdiction. As indicated in the discussion of the mail fraud counts, these notices lulled investors into feeling their investments were secure. Lulling mailings warrant jurisdiction over securities fraud. *See United States v. Love,* 535 F.2d 1152, 1159 (9th Cir.), *cert. denied,* 429 U.S. 847, 97 S.Ct. 130, 50 L.Ed.2d 119 (1976).

## CONSPIRACY INSTRUCTIONS

■ All defendants challenge the court's conspiracy instructions. They argue first that it was error for Instruction 68 to incorporate Count 1 of the indictment in its description of the conspiracy's overt acts. They contend that the jury could have based its finding of an overt act on introductory paragraphs of Count 1 that alleged only that Krimbel Trucking was engaged in the transportation of property.

The contention has no merit. Instruction 68 incorporates only the acts alleged in Count 1, not all paragraphs of that count. The instruction distinguished between the allegations in the initial paragraphs of Count 1 and the overt acts in Count 1. Incorporation of overt acts in this manner is standard practice, and we see no way in which it could have confused the jury.

■ Defendants contend that the instructions did not require unanimity. They say that instruction 70, stating that the jury must find at least one conspirator guilty of one of the overt acts, did not require unanimity because members of the jury may have relied on different overt acts.

Instruction 70 referred several times to "the overt act" or "such overt act." It strongly suggested that the jury had to agree on the overt act that showed that the conspiracy took effect. In addition, Instruction 77 required that the jury decide unanimously. We read the instructions as a whole to determine their fairness and propriety. *United States v. Wolters,* 656 F.2d 523, 526 (9th Cir.1981). Instruction 70, taken together with Instruction 77, required that the jury decide unanimously on the overt act committed.

## COMMON CARRIER STATUS OF KRIMBEL

■ The defendants argue that their convictions for misapplication of funds must be overturned because they were not the officers of a "common carrier" as required by 18 U.S.C. § 660. This argument fails.

Although the government argues that section 660 extends to private carriers, we need not decide this issue. It is apparent that Krimbel met the test for a common carrier by holding itself out to the public for hire. *See Arrow Aviation, Inc. v. Moore,* 266 F.2d 488, 490 (8th Cir.1959). Jamerson admitted that Krimbel would haul "whatever it could" if it had no shake orders going from Washington to California. Although Krimbel had only six private contract clients, it hauled loads in 1977 for 94 firms. This public availability brings it within the reach of section 660.

## DENIAL OF SPEEDY TRIAL RIGHT

■ Jamerson contends that continuance of the trial date from December 7, 1981 to March 22, 1982 violated the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* He

suggests that the government sought the continuance in order to get the superseding indictment.

The record is clear that a continuance was necessary to secure continuity of counsel for defendant Webber, a reason contemplated by the Speedy Trial Act. *See* 18 U.S.C. § 3161(h)(8)(B)(iv). We agree also with the court's conclusion that the complexity of the case warranted a continuance. *See* 18 U.S.C. § 3161(h)(8)(B)(ii).

■ Although the court could have severed the case and tried Jamerson separately, that is a matter left to the court's discretion. Given the complexity of the case and the overlapping proof on different counts, there was no abuse of discretion. *See United States v. Nolan,* 700 F.2d 479, 483 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983).

## SENTENCING

■ Jamerson raises the novel argument that the court imposed an illegal sentence by ordering, on separate counts, a prison sentence concurrent with a probation term that required restitution. He relies on *United States v. Edick,* 603 F.2d 772 (9th Cir.1979), which addressed the imposition of consecutive sentences for a single act that violated multiple provisions of the firearms laws.

Although language in *Edick* suggests that probation and prison terms may not be served concurrently, *id.* at 777, that language was clearly dictum unrelated to the holding or focus of the case. Nothing in logic or law suggests that a court may not impose concurrent prison and probation terms. In *Green v. United States,* 298 F.2d 230, 232 (9th Cir.1961), the court held squarely that concurrent prison and probation terms were permissible. The Supreme Court has left undisturbed concurrent prison and probation sentences. *See Burns v. United States,* 287 U.S. 216, 223, 53 S.Ct. 154, 156, 77 L.Ed. 266 (1932).

Section 3651 of Title 18 gives the court broad discretion in fashioning the terms of probation. In general, a concurrent probation and prison term on separate counts will benefit the defendant because restraints on liberty will end sooner than if probation were imposed consecutively to the prison term. We find no error in the court's imposition of concurrent probation and prison terms.

■ We reject also Jamerson's claim that the court did not tailor the terms of probation to his situation because it required restitution. As long as the sentence falls within the statutory limits, it is not generally subject to appellate review. *United States v. Mitsubishi International Corp.,* 677 F.2d 785, 787 (9th Cir.1982). Section 3651 empowers the courts to award restitution and we have approved sentences that required probation and restitution. *See Phillips v. United States,* 679 F.2d 192, 194 (9th Cir.1982).

## SELECTIVE AND VINDICTIVE PROSECUTION

■ Jamerson contends that he was the target of both selective and vindictive prosecution. To establish selective prosecution, he must show that others similarly situated have not been prosecuted and that the prosecution was based on an impermissible motive. *United States v. Ness,* 652 F.2d 890, 892 (9th Cir.), *cert. denied,* 454 U.S. 1126, 102 S.Ct. 976, 71 L.Ed.2d 113 (1981).

■ Jamerson argues that he is the only person ever prosecuted under 18 U.S.C. § 660 who has not gained personally from the misapplication of funds. He has offered no evidence to show that others who misapplied funds have not been prosecuted. Because he has failed to show selectivity, we affirm the denial of his motion to dismiss on that ground.

■ Jamerson did not move before trial to dismiss on vindictive prosecution grounds. Although he argues that he used the words "bad faith" to describe his vindictive prosecution claim, the record shows that he used "bad faith" in connection with his selective prosecution claim. He raised no vindictive prosecution claim below and has waived that objection. *See United*

**1324**

*States v. Hearst,* 638 F.2d 1190, 1196 (9th Cir.1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981).

## CONCLUSION

We affirm the convictions on all counts. The mandate will issue at once.