UNITED STATES of America,
Plaintiff–Appellee,

v.

Samuel MANARITE and Jeanne
Manarite, Defendants–
Appellants.

Nos. 93–10527, 93–10528.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 5, 1994.

Decided Jan. 6, 1995.

As Amended on Denial of Rehearing
March 15, 1995.

Arthur L. Allen, P. Danice Johnson, Asst. Federal Public Defenders, Mark A. Hutchison, José León, Morris, Brignone & Pickering, Las Vegas, NV, for defendants-appellants.

Jane H. Shoemaker, Asst. U.S. Atty., Organized Crime Strike Force, Las Vegas, NV, for plaintiff-appellee.

Before: SNEED, PREGERSON, and WIGGINS, Circuit Judges.

SNEED, Circuit Judge:

Samuel and Jeanne Manarite appeal their convictions for conspiracy, money laundering, and interstate transportation and receipt of stolen property.[1] They contend that the trial

---

1. The counts of the indictment were as follows:
 *Count 1:* Conspiracy in violation of 18 U.S.C. § 371 to commit (1) money laundering in violation of 18 U.S.C. § 1956(a)(3)(A) & (B) (chip-cashing scheme) and § 1956(a)(1)(B)(i) (chips obtained through credit scam and boat burglary); (2) mail fraud in violation of 18 U.S.C. § 1341 (credit scam); (3) wire fraud in viola-

 tion of 18 U.S.C. § 1343 (credit scam); (4) interstate transportation of stolen property in violation of 18 U.S.C. § 2314 (burglary proceeds); and (5) receipt of stolen property in violation of 18 U.S.C. § 2315 (burglary proceeds).
 *Counts 2 and 3:* Money laundering in violation of 18 U.S.C. § 1956(a)(3)(A) & (B) and aiding

court erred in (1) denying their motions for judgment of acquittal, (2) refusing to instruct the jury on entrapment, (3) denying Jeanne Manarite's motion to sever, (4) admitting evidence of Samuel Manarite's parole status, and (5) assessing their sentences. We reverse the Manarites' conspiracy convictions, vacate their sentences, and remand the case for resentencing.

## I.

### FACTS AND PROCEEDINGS BELOW

This case involves three criminal schemes that developed as a result of a sting operation conducted by the Federal Bureau of Investigation (FBI) in Las Vegas, Nevada, *viz.*, a casino chip-cashing scheme, a casino credit scam, and the burglary of a fictitious drug dealer's boat.

Under the FBI's direction, an informant, Richard McLaughlin, set out to "get close" to Samuel Manarite. Manarite had an extensive criminal record and was reputed to have ties to the Mafia. They first met in December 1991, when McLaughlin approached Manarite to sell him some jewelry. Though Manarite had intermittent suspicions that McLaughlin was a cop, the two became acquaintances.

Manarite suggested that they could "earn some money together." McLaughlin told Manarite that he had a contact at the Maxim casino, "Bill Peterson," who was in fact FBI Special Agent William Matthews. Over the next few weeks, McLaughlin and Manarite discussed possible ways to make money at the casino, in the course of which McLaughlin often wore a wire.

### A. The Chip–Cashing Scheme

The first result of these meetings was a chip-cashing scheme, which unfolded in this manner. Sometime during March 1992, McLaughlin met with Manarite and his wife, Jeanne. McLaughlin told them that "Peterson" had a dealer who was skimming casino chips off the blackjack tables and needed someone to cash them. The Manarites proposed various ways to cash the chips; Jeanne suggested taking them to the cage in small amounts. Eventually, it was agreed that the Manarites and McLaughlin would cash the chips. During March and April, $17,925 worth of casino chips were cashed. Jeanne and their son, Robert, did much of the work because Samuel was on parole, and Jeanne didn't want to "risk" him. At the end of April, "Peterson" told Samuel Manarite that the dealer had become nervous and had stopped skimming chips.

### B. The Credit Scam

The sting operation now entered its second phase. In May, "Peterson" and McLaughlin met with the Manarites to devise a credit scam. On May 16, as planned, Sandra Bonham, a friend of Robert Manarite, used a fake driver's license and filed a false credit application at the Maxim casino. "Peterson" approved $5,000 credit to Bonham up front. The scam was carried out on a Saturday, to prevent the casino from processing the application until Monday. Bonham took the money in chips, gambled awhile to avoid looking suspicious, and gave $4,800 in chips to the Manarites. Over the next few days, McLaughlin and Samuel Manarite cashed the chips.

### C. The Burglary of a Boat

In June, to instigate the third sting operation, "Peterson" approached Samuel Manarite with a burglary scheme. "Peterson" claimed that he laundered money for a drug dealer in California. He said that during his visits, he and the dealer would invariably go

and abetting in violation of 18 U.S.C. § 2 (chip-cashing scheme).
*Count 4:* Wire fraud in violation of 18 U.S.C. § 1343 and aiding and abetting in violation of 18 U.S.C. § 2 (credit scam).
*Count 5:* Money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and aiding and abetting in violation of 18 U.S.C. § 2 (cashing chips obtained through credit scam).
*Count 6:* Interstate transportation of stolen property in violation of 18 U.S.C. § 2314 and

aiding and abetting in violation of 18 U.S.C. § 2 (burglary proceeds).
*Count 7:* Receipt of stolen property in violation of 18 U.S.C. § 2315 and aiding and abetting in violation of 18 U.S.C. § 2 (burglary proceeds).
*Count 8:* Money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and aiding and abetting in violation of 18 U.S.C. § 2 (cashing chips obtained in boat burglary).

out to lunch, leaving the money aboard the dealer's boat. "Peterson" assured Manarite that the boat would be left unattended with the door unlocked, so it would be easy to steal the money. Manarite agreed to arrange the burglary.

McLaughlin and Jeanne and Robert Manarite met in Marina Del Rey, California, on June 9. McLaughlin and Jeanne acted as lookouts while Robert boarded the boat and removed $18,300 worth of cash and casino chips, plus three pieces of jewelry. Of course, the boat and everything on board were actually owned by the FBI. The three drove the proceeds of the burglary back to Las Vegas. The sting operations, so far as we know, were finished.

Samuel and Jeanne Manarite were indicted on January 26, 1993. Both were charged with conspiracy, money laundering, wire fraud, interstate transportation and receipt of stolen property, and aiding and abetting. The Manarites were tried together. At the close of the government's case, both moved for judgment of acquittal under Rule 29(a). Their motions were denied. Jeanne Manarite requested that the judge instruct the jury on entrapment. The judge refused. The jury convicted both defendants of all counts except those related to the credit scam.[2] The defendants moved again for judgment of acquittal under Rule 29(c). The court denied their motion.

The defendants timely appeal. This court has jurisdiction under 28 U.S.C. § 1291. We hold that the Manarites' convictions for conspiracy must be reversed. We affirm the remainder of their convictions.

## II.

### DISCUSSION

#### A. The Conspiracy Convictions

The Manarites contend they were entitled to a judgment of acquittal because their con-

victions were based on insufficient evidence. We agree with respect to the conspiracy convictions.

This court uses the same standard of review for denial of a motion for judgment of acquittal as it does for a challenge to the sufficiency of the evidence. *United States v. Shirley*, 884 F.2d 1130, 1134 (9th Cir.1989). We must review the evidence in the light most favorable to the government to determine whether " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)) (emphasis in original). The evidence is insufficient to support a conviction for the substantive crime of either mail or wire fraud. As will appear subsequently, the Manarites could not be convicted of *conspiracy* to commit mail or wire fraud, either. The conspiracy charge did include several *other* crimes as objects of the conspiracy, any one of which would have been sufficient to support the conspiracy convictions. The jury, however, used a general verdict form, which does not reveal which object or objects the jurors relied on to find the Manarites guilty of conspiracy. Because the jurors could have relied exclusively on the legally insufficient objects (mail or wire fraud), we are obliged to reverse the Manarites' conspiracy convictions.

#### 1. *Insufficiency of the mail fraud[3] and wire fraud[4] objects.*

The Manarites argue that the evidence was insufficient to support their convictions for conspiracy to commit mail and wire fraud. In particular, they maintain that the telephone calls and mailings resulting from the credit scam at the Maxim casino were not in furtherance of the scheme. We agree.

We have interpreted the mail fraud statute to require proof that the accused (1) participated in a scheme or artifice to defraud, and (2) caused a use of the mails, (3) for the purpose of executing the scheme. *United States v. Brutzman*, 731 F.2d 1449, 1454 (9th Cir.1984).[5] The issue is whether

---

2. The Manarites were acquitted on Counts 4 and 5.

3. Object (2) of Count 1 (Conspiracy) of the indictments.

4. Object (3) of Count 1 (Conspiracy) of the indictments.

5. The mail fraud and wire fraud statutes "share identical language" regarding the scheme re-

the Manarites' actions in executing the fraud on a weekend, in order to ensure that the casino would be unable to process the false credit application until Monday, caused a use of the mails for the purpose of executing the scheme.

The Manarites rely mainly on *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). There, the accused traveled to California with his roommate's credit card and charged motel rooms and meals. He was indicted for mail fraud, based on the motels' mailing sales slips to the bank that had issued the card, which then mailed a bill to the roommate. The government argued that "the delay in this mailing would enable the [defendant] to continue purchasing goods and services for an appreciable period of time." *Id.* at 397, 94 S.Ct. at 647.

The Court, however, found that the mailings did not further Maze's scheme. Maze's scheme had already been completed; it "reached fruition when he checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss." *Id.* at 402, 94 S.Ct. at 649. The mailings were merely "directed to the end of adjusting accounts between the motel proprietor, the Louisville bank, and [the roommate], all of whom had ... been the victims" of the scheme. *Id.*

Here, the government argues that, unlike the defendant in *Maze*, the Manarites deliberately structured the credit scam to delay the inevitable mailing or phone call.[6] This is true; however, their scheme was complete when they cashed the chips. The fact that the *delay* enhanced the Manarites' ability to escape detection is insufficient. Moreover, their chance of avoiding detection would have been enhanced even more had there been *no* use of the mails or telephone at all.

The government points out that "[l]etters mailed after the defrauders have received their money may be in furtherance of the fraudulent scheme." *Brutzman*, 731 F.2d at 1454. The Supreme Court has identified two such scenarios: the "lulling scheme" and the "ongoing scheme." The Manarites' case, however, does not fall into either category.

In a lulling scheme, subsequent mailings are "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely." *Maze*, 414 U.S. at 403, 94 S.Ct. at 650 (distinguishing *United States v. Sampson*, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962)); *see, e.g., Sampson*, 371 U.S. 75, 83 S.Ct. 173; *Brutzman*, 731 F.2d 1449; *United States v. Jones*, 712 F.2d 1316 (9th Cir.), *cert. denied*, 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983); *United States v. Miller*, 676 F.2d 359 (9th Cir.), *cert. denied*, 459 U.S. 856, 103 S.Ct. 126, 74 L.Ed.2d 109 (1982). "In such a scheme, the mailing reassures the victim that all is well, discouraging him from investigating and uncovering the fraud." *Jones*, 712 F.2d at 1321. Lulling schemes can include mailings sent by someone other than the defrauder, even routine mailings in the ordinary course of business. *See, e.g., id.* at 1320 (notices of lease payments made by nearly bankrupt corporation sent to investors

---

quirements, so the wire fraud statute is read in light of the case law on mail fraud. *U.S. v. Louderman*, 576 F.2d 1383, 1387 n. 3 (9th Cir.), *cert. denied*, 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978). Both provide that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises [mails or causes to be mailed]/[transmits or causes to be transmitted] for the purpose of executing such scheme or artifice ... shall be fined ... or imprisoned...." 18 U.S.C. § 1341; 18 U.S.C. § 1343.

**6.** In support of its position, the government cites two pre-*Maze* cases, *United States v. Kelem*, 416

F.2d 346 (9th Cir.1969), *cert. denied*, 397 U.S. 952, 90 S.Ct. 977, 25 L.Ed.2d 134 (1970) (finding mail fraud where defendants undertook scheme to sell airline tickets purchased with credit cards, never paying the bills), and *Suhl v. United States*, 390 F.2d 547 (9th Cir.), *cert. denied*, 391 U.S. 964, 88 S.Ct. 2035, 20 L.Ed.2d 879 (1968) (holding that check-kiting scheme constituted mail fraud where worthless checks were passed between defendants' bank accounts in separate cities). But their validity is suspect in light of *Maze*, which disapproved *Kelem* in particular. *See* 414 U.S. at 398 n. 2, 94 S.Ct. at 647 n. 2. Furthermore, unlike this case, both *Kelem* and *Suhl* involved ongoing schemes that depended upon the delay for their continued success. *See Kelem*, 416 F.2d at 348; *Suhl*, 390 F.2d at 549–50.

in fraudulent sale/leaseback transactions); *Brutzman,* 731 F.2d at 1454 (defrauded investors' letters demanding refunds, which were promised as part of the scheme). Such mailings, too, have the effect of reassuring the victim that all is well.

The Court in *Maze* distinguished the defendant's situation from a lulling scheme, finding that the mailings between the motels, the bank, and the roommate made it *more* likely that Maze's fraud would be detected. 414 U.S. at 403, 94 S.Ct. at 650. Maze "probably would have preferred to have the invoices misplaced ... and never mailed at all." *Id.* at 402, 94 S.Ct. at 649. The same is true in this case. The prospective mailings and phone calls were clearly not part of any kind of lulling scheme. They would not assure the victim that all is well; rather, they would have exposed the credit scam and increased the likelihood of the Manarites' apprehension. *See id.* at 403, 94 S.Ct. at 650.

It is also true that the use of the mails and telephone in this case would not have furthered an *"ongoing* scheme." In *Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), the defendant bought used cars, rolled back their odometers, and sold them at inflated prices to car dealers, who in turn sold them to customers. He was convicted of mail fraud based on the dealers' mailing title-application forms to the Wisconsin Department of Transportation on behalf of customers. The Supreme Court upheld this application of the statute. Finding that "the success of Schmuck's venture depended upon his harmonious relations with, and good reputation among, retail dealers," as well as their ability to resell Schmuck's cars, the Court held that "a rational jury could have found that the title-registration mailings were part of the execution of the fraudulent scheme, a scheme which did not reach fruition until the retail dealers resold the cars and effected transfers of title." *Id.* at 711–12, 109 S.Ct. at 1448.

The Manarites' credit scam was not an ongoing scheme. As in *Maze,* the scheme was completed upon receipt of the $5,000 credit advance and the cashing of the chips. The credit application requested only $5,000. It was a "'one-shot' operation." *Schmuck,* 489 U.S. at 711, 109 S.Ct. at 1448. The

Manarites did not seek to gain the trust of the casino or to facilitate any additional transactions, nor did they need to do so to reap the rewards of the scam.

In sum, the mailings and phone calls in this case simply were not in any way " 'incident to an essential part of the scheme.' " *Id.* at 712, 109 S.Ct. at 1448 (quoting *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954)). Although the evidence shows "that (a) there was a scheme to defraud, (b) [the defendants] were involved, and (c) a mailing occurred," that is not enough to convict the Manarites absent proof that the "mailing was in furtherance of the scheme to defraud." *United States v. Kaplan,* 554 F.2d 958, 965 (9th Cir.), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977).

### 2. *Defects in the conspiracy convictions.*

■ The Manarites were acquitted of the substantive wire fraud count, but were convicted on the conspiracy count, which included as its objects mail and wire fraud. However, as already indicated, the credit scam the Manarites carried out did not constitute mail or wire fraud as a matter of law. Any one of the remaining objects of the conspiracy (money laundering, etc.) alone would have been legally sufficient to support the conspiracy convictions; however, in the Manarites' case, there is no way to know which objects the jury relied on in its decision to convict them of conspiracy. In finding the Manarites guilty of conspiracy, the jury used a general verdict form, which gave no indication of which object or objects formed the basis of their decision.

As indicated earlier, the conspiracy convictions cannot stand. "[I]f the judge instructs the jury that it need find only one of the multiple objects, and the reviewing court holds any of the supporting counts legally insufficient, the conspiracy count also fails." *United States v. DeLuca,* 692 F.2d 1277, 1281 (9th Cir.1982). The problem "springs from the combined effect of the composite conspiracy count, the one-is-enough jury charge, and the failure of one of the substantive crime counts to charge a crime." *United States v. Carman,* 577 F.2d 556, 568 (9th Cir.1978).

■ Under 18 U.S.C. § 371, a single charge of conspiracy can have multiple objects, but each object alleged must constitute a federal offense.[7] In the Manarites' case, the mail and wire fraud objects alleged in the conspiracy charge were legally insufficient to be federal offenses.[8] Because the Manarites were acquitted of the substantive wire fraud charges, one could argue that the jury likely did not base the conspiracy convictions on mail or wire fraud. Nonetheless, because the jury used a general verdict form, there is no way to be certain. *Carman*, 577 F.2d at 566, 568. It is possible that the jury in this case acquitted the Manarites of the substantive count, yet used mail and wire fraud as the basis of the conspiracy convictions. *See United States v. Guzman*, 849 F.2d 447, 448 (9th Cir.1988); *Carman*, 577 F.2d at 567.

■ That uncertainty is enough to doom the Manarites' conspiracy convictions. Accordingly, we reverse them.[9]

### B. *The Money Laundering Convictions.*[10]

#### 1. *Specified unlawful activity.*

■ The Manarites argue that, in the chip-cashing scheme, the government failed to prove that the casino chips were represented to be the proceeds of "specified unlawful activity" as required by the statute. The statute defines "specified unlawful activity" as including offenses listed in § 1961(1). 18 U.S.C. § 1956(c)(7)(A). These offenses include "any act ... involving ... gambling ... which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A). The government based its case on two Nevada gambling statutes: (1) Nev.Rev.Stat. § 465.070(3), which prohibits taking anything of value "in or from a gambling game," and (2) Nev.Rev.Stat. § 465.083, which prohibits cheating, a lesser included offense.

The Manarites argue that the Nevada statutes require proof that the crime be committed *during the course of a game.* According to the Manarites, McLaughlin and "Peterson" said only that the chips were being taken off the tables. Therefore, they insist, the government failed to represent the chips as the proceeds of "specified unlawful activity."

7. *United States v. Clay*, 495 F.2d 700 (7th Cir.), *cert. denied*, 419 U.S. 937, 95 S.Ct. 207, 42 L.Ed.2d 164 (1974). There must be proof of an agreement "to accomplish something that constitutes an offense against the United States," as well as an overt act. *United States v. Lichtenstein*, 610 F.2d 1272 (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980); *see also Lubin v. United States*, 313 F.2d 419, 422 (9th Cir.1963) ("We do not think that the Congress, in enacting the conspiracy statute, intended to make criminal schemes which, if successfully carried out, would not result in the commission of federal substantive offenses.").

8. Their case is analogous to *United States v. DeLuca*, 692 F.2d 1277 (9th Cir.1982), in which the defendants were convicted of destruction of a building with an explosive in violation of 18 U.S.C. § 844. There the court held that gasoline fires were not within the meaning of "explosive" and not only reversed the defendants' convictions, but also reversed their convictions under a multiple-object conspiracy charge. The court said "the jury could have focused on [the] legally insufficient object of the conspiracy." *Id.* at 1281; *accord Carman*, 577 F.2d at 568; *United States v. Talkington*, 589 F.2d 415, 417–18 (9th Cir.1978) (per curiam).

9. Our reversal of the conspiracy convictions does not undermine the validity of the Manarites' convictions on the *substantive* counts, despite the fact that the jury was given a *Pinkerton* instruction, *see Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). We assume, *arguendo*, that our reversal of the conspiracy convictions would mandate reversal of any substantive convictions based *solely* on *Pinkerton* coconspirator liability. *See U.S. v. Castaneda*, 16 F.3d 1504 (9th Cir.1994). Nonetheless, we find beyond a reasonable doubt that the jury in this case would have convicted the Manarites of the substantive counts based on principal or aider-and-abettor liability, with or without a *Pinkerton* charge. *See id.* at 1511. The evidence clearly shows that both Samuel and Jeanne Manarite directly participated in the substantive crimes of which they were convicted, money laundering and transportation and receipt of stolen property.

10. The Manarites were convicted under two separate sections of the money laundering statute. The primary difference between them is that § 1956(a)(1) requires the money involved to be "in fact" the proceeds of unlawful activity, while § 1956(a)(3) is designed for government sting operations using money "represented to be" the proceeds of unlawful activity, but which is, in fact, government property.

■ We disagree. First, § 465.070(3) does not appear to require that the taking occur *during* a gambling game. The language is as follows:

It is unlawful for any person:

\* \* \* \* \* \*

3. To claim, collect, or take ... money or anything of value *in or from* a gambling game, with intent to defraud, without having made a wager contingent thereon, or to claim, collect or take an amount greater than the amount won.

Nev.Rev.Stat. § 465.070 (emphasis added). Under the plain language of the statute, taking chips off a blackjack table constitutes taking "anything of value in or from a gambling game." A game need not be in progress.

Even were this not true, the evidence in the record, viewed in the light most favorable to the government, shows that McLaughlin and "Peterson" *did* represent chips to have been taken while blackjack games were in progress. Both described to the Manarites how the chips were being "skimmed" by the dealer, who was working with accomplices posing as players and paying them double on winning hands or paying out on losing hands.

## 2. *Intent.*

■ Money laundering under § 1956(a)(3) requires the government to prove that the Manarites conducted a financial transaction with the intent either (1) "to promote the carrying on of specified unlawful activity," 18 U.S.C. § 1956(a)(3)(A), or (2) "to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity," 18 U.S.C. § 1956(a)(3)(B). *See United States v. Montoya*, 945 F.2d 1068, 1076 (9th Cir.1991) (construing nearly identical intent requirements of 18 U.S.C. § 1956(a)(1)).

The Manarites argue that they lacked the required intent. Even if the chips were represented to be the proceeds of specified unlawful activity, they assert that the evidence showed that Samuel Manarite did not believe the representations. The government counters that lack of belief is irrelevant. It need only prove that the representations were made.[11]

We need not resolve this issue. Viewed in the light most favorable to the government, the evidence is such that a rational jury could find that Samuel Manarite did, in fact, believe McLaughlin's and "Peterson's" statements regarding the illegal source of the chips.

## 3. *Requisite specific intent.*

The Manarites next contend that the government failed to prove the requisite specific intent, that is, that they intended either "to promote the carrying on" of the chip-skimming operation per (a)(3)(A) or "to conceal or disguise the nature, location, source, ownership, or control" of the skimmed chips per (a)(3)(B). Proof of *either* intent prong will support the Manarites' convictions. We find the evidence sufficient to prove both.

The Manarites, to refute the presence of an intent "to promote, etc.," rely heavily on *United States v. Jackson*, 935 F.2d 832 (7th Cir.1991).[12] There the defendant, a preacher, deposited cash from his drug dealing into a church account that also contained legitimate church funds. 935 F.2d at 836. He later wrote checks on that account to purchase cellular telephone services, to pay his rent, and to obtain cash. *Id.* at 837.

The court found that the government had failed to prove that these transactions, which were wholly unrelated to the drug dealing, in any way promoted that illegal activity. *Id.* Judge Flaum described the "promote" prong as "aimed at ... the practice of plowing back

---

**11.** In the government's view, proof that the Manarites believed the chips to be illegally obtained is required only under § 1956(a)(3)(B). Presumably, the government's reasoning is that if a defendant has the intent to promote unlawful activity under (a)(3)(A), it can be inferred that she believes such activity is actually taking place.

This issue has not yet been addressed by the courts, but the government's view, based on the plain language of the statute, is logical.

**12.** *Jackson* involved a prosecution under § 1956(a)(1) rather than (a)(3), but the intent requirements are virtually identical.

proceeds of 'specified unlawful activity' to promote the activity." *Id.* at 842.

The Manarites argue that intent "to promote the carrying on" of the illegal activity can *only* be found when the proceeds are "plowed back" into the activity. They argue that in their case, none of the cash was plowed back into the chip-cashing scheme. Instead, the Manarites simply distributed the cash, pocketing their share.

We reject this view. In *United States v. Montoya,* 945 F.2d 1068 (9th Cir.1991), a California state senator was convicted after an FBI sting operation in which he accepted a bribe in the form of a check from an undercover agent, which he deposited in his personal account. Montoya argued that depositing the check "could not have 'promoted' the unlawful activity, namely the bribe, because the activity had been completed upon receipt of the check from the undercover FBI Agent." *Id.* at 1076. We rejected this argument: "Montoya could not have made use of the funds without depositing the check. Moreover, depositing the check provided an opportunity for Montoya to carry out the illegal bribery by characterizing the funds as a legitimate honorarium." *Id.* We concluded that the evidence was sufficient for a jury to find that Montoya had deposited the check with the intent to promote the bribery.[13]

The situation in *Montoya* is analogous to this case. The chip-skimming scheme could not benefit its participants unless the chips were cashed. A rational jury could conclude that the Manarites cashed the chips with the intent to promote the chip-skimming scheme. "Plowing back" of the gains into the enterprise is not necessary.

The Manarites also argue that the government failed to prove, as required by 1956(a)(3)(B), that they intended "to conceal or disguise the nature, source, location, ownership, or control" of the chips. This argument is meritless. It is clear from the record that the Manarites' actions were intended to disguise the fact that the chips had

been skimmed from blackjack tables. The Manarites individually cashed the chips in small quantities, at different times and at different windows, sometimes even at different casinos. The fact that they did not wear disguises and were aware of being videotaped by surveillance cameras does not negate their intent to conceal. *United States v. Lovett,* 964 F.2d 1029, 1034 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 169, 121 L.Ed.2d 117 (1992) (noting that there is "no requirement in the statute ... that every money laundering conviction must be supported by evidence of intent to conceal the identity of the participants to the transaction"). It is enough that the Manarites sought to "conceal or disguise *in any manner* the nature, location, source, ownership or control" of the chips. *Id.* at 1034 n. 3 (emphasis in original).

### 4. Cashing the chips constituted money laundering.

The Manarites also maintain that they only spent their chips, rather than laundering them. Their case, however, is unlike those on which they rely. *See, e.g., United States v. Garcia–Emanuel,* 14 F.3d 1469 (10th Cir.1994) (defendant used drug money to pay his mortgage, and to buy a horse, a trailer, and a watch); *United States v. Sanders,* 928 F.2d 940 (10th Cir.), *cert. denied,* 502 U.S. 845, 112 S.Ct. 142, 116 L.Ed.2d 109 (1991) (defendant bought two cars with drug money). In those cases, the defendant engaged in ordinary commercial transactions with cash that happened to be the proceeds of drug dealing. The transactions were not "engaged in for the *purpose* of concealing assets," *Garcia–Emanuel,* 14 F.3d at 1474 (emphasis in original); instead, they involved cash that had *already* been laundered and was being spent "for present personal benefit, and not to create the appearance of legitimate wealth." *Id.*

The Manarites were not simply "spending" the proceeds of the chip-skimming scheme. Their argument ignores a fundamental step in realizing their gain. The Manarites had to

---

13. *Accord United States v. Paramo,* 998 F.2d 1212, 1218 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1076, 127 L.Ed.2d 393 (1994) (holding that cashing embezzled IRS checks promoted "each preceding mail fraud by creating value out of an otherwise unremunerative enterprise"); *United States v. Cavalier,* 17 F.3d 90 (5th Cir.1994) (holding that mail fraud was promoted when the false theft report caused the insurer to send a check).

cash the chips in order to reap the rewards of the scheme.

### C. *The Stolen Property Convictions*

 The Manarites, in what amounts to an attack on sting operations generally, argue that their convictions for transportation and receipt of stolen property cannot stand because the property was not in fact stolen.[14] They claim the government implicitly authorized them to take the government-owned property from the boat through Agent Matthews' aid and encouragement. The government's unsurprising position is that providing the opportunity to commit a burglary involving government-owned property does not mean that the government has consented to its taking. We find that the government has the better argument.

Nonetheless, the law cited by neither side is on point. The Manarites rely on cases which involved stolen property recovered by the police and then used in sting operations to apprehend those who buy and sell stolen property. *E.g., United States v. Dove*, 629 F.2d 325 (4th Cir.1980). There is no question in this case about whether the property taken retained its stolen character. The property belonged to the government and the Manarites took it and then transported and disposed of it. The government cites authorities for various definitions of "stolen," all of which involve taking without the owner's consent. These cases miss the point. The issue is whether the government, by suggesting that its own property could be stolen and how the theft could be accomplished, has consented to the taking.

We think not.[15] The Manarites seized the opportunity provided them by an undercover agent to commit a burglary, stealing government property in the process. It is true that the government tempted the Manarites with the prospect of gain from theft. But the FBI agent did not give them permission to take property from the "drug dealer's" boat or suggest that the drug dealer would permit it.

The morality of sting operations is troublesome. Deceit by officers of the law is employed for the purpose of securing arrests and convictions of persons they suspect have been engaged in wrongdoing for which there exists insufficient evidence to secure convictions or possibly even arrests. Deceit, however, is not always immoral. A comparison of the deceit of Shakespeare's Iago with that of Rostand's Cyrano makes that clear. It is the purpose of the deceiver on which the difference rests. Officers of the law who conduct a sting operation after having reason to suspect an individual of wrongdoing are not acting in an immoral manner. They are protecting society. The same cannot be said of officers who entrap their victims. To that issue we now turn.

### D. *Entrapment*

Jeanne Manarite argues that the trial court erred in refusing to submit an instruction on entrapment to the jury. We find that there is no evidence in the record that government agents induced her to commit any of the crimes with which she was charged.[16]

To be entitled to an entrapment defense, the defendant must present evidence that she was "(1) induced to commit the crime by a government agent and (2) not otherwise predisposed to commit the crime." *United States v. Kessee*, 992 F.2d 1001, 1003 (9th Cir.1993). The defendant must present evidence of both elements, *id.*, but the threshold is very low: "[O]nly *'slight'* evidence is needed to create a factual issue and get the defense to the jury.'" *Id.* (quoting *United*

---

14. They also contest their convictions for money laundering under § 1956(a)(1), based on cashing the chips taken from the boat. Their argument is that the government failed to prove that the chips were "in fact" the proceeds of specified unlawful activity (i.e., the burglary) because they were technically not stolen.

15. In cases involving "fences," courts have been careful to require that stolen property in fact be stolen because that is the heart of the crime; otherwise, the defendants would be guilty of nothing more than dealing in used goods.

16. This Circuit has not yet settled on the standard of review applicable to a district court's denial of a proposed jury instruction. In some cases, this court has reviewed the decision *de novo*, in others, for abuse of discretion. *United States v. LaFleur*, 971 F.2d 200, 204 (9th Cir. 1991), *cert. denied,* ── U.S. ──, 113 S.Ct. 1292, 122 L.Ed.2d 683 (1993). We need not reach the issue, however, because under either standard, Jeanne Manarite was not entitled to an entrapment instruction.

*States v. Sotello–Murillo,* 887 F.2d 176, 179 (9th Cir.1989)) (emphasis in original). Indeed, the "'evidence may be weak, insufficient, inconsistent, or of doubtful credibility.'" *Id.* (quoting *Sotelo–Murillo,* 887 F.2d at 178). If the defendant makes such a showing, she is "entitled to an instruction unless the prosecution rebuts the evidence such that 'no rational jury could entertain a reasonable doubt as to either element.'" *Id.* (quoting *United States v. Hoyt,* 879 F.2d 505, 509 (9th Cir.1989)).

■ The primary flaw in Jeanne Manarite's argument is that the government agents' contact was almost exclusively with her husband. If any inducement occurred, it was Samuel Manarite, not Jeanne, who was induced. Samuel may have persuaded Jeanne to participate in the schemes to shield him from involvement because of his parole status. This Circuit, however, does not recognize the theory of "derivative entrapment." *United States v. Bonanno,* 852 F.2d 434, 439 (9th Cir.1988), *cert. denied,* 488 U.S. 1016, 109 S.Ct. 812, 102 L.Ed.2d 801 (1989). Thus, "[i]nducement by a private party is not entrapment." *United States v. Emmert,* 829 F.2d 805, 808 (9th Cir.1987).

■ Nor is there any evidence of entrapment in Jeanne Manarite's contact with government agents. She was present at the meeting where the chip-cashing scheme was first discussed, but McLaughlin did not directly ask her or Samuel Manarite to cash the chips. He told them that "Peterson" and the dealer needed someone to cash the chips, and the Manarites volunteered. McLaughlin's actions did not rise to the level of inducement: "Mere suggestions or the offering of an opportunity to commit a crime is not conduct amounting to inducement." *United States v. Simas,* 937 F.2d 459, 462 (9th Cir. 1991). Inducement is government conduct that creates a substantial risk that an otherwise law-abiding person will commit a crime, including "persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *United States v.*

*Garza–Juarez,* 992 F.2d 896, 909 (9th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994) (citations omitted). None of these circumstances existed in this case.

There is no evidence whatsoever that Jeanne Manarite was the victim of government entrapment. The trial court did not err in refusing to instruct the jury on the entrapment defense.

**E. *Admission of Prejudicial Evidence***

Samuel Manarite argues that the trial court erred in admitting evidence of his parole status and of his paranoia about law enforcement scrutiny. He maintains that these references should have been excluded under Rules 404(b) and 403 of the Federal Rules of Evidence, because the government offered the evidence to show criminal propensity.[17] The government argues that the evidence was properly admitted to show that Manarite knew the schemes were illegal and to explain why he sent Jeanne and Robert Manarite to carry out some of the crimes. The explanation was that his parole status subjected him to police scrutiny and the risk of greater punishment if caught.

■ We review the district court's admission of Rule 404(b) evidence for an abuse of discretion; however, the determination that the evidence falls within the scope of the Rule is reviewed *de novo. United States v. Arambula–Ruiz,* 987 F.2d 599, 602 (9th Cir. 1993). Although there is no case law directly on point, we think it obvious that evidence of a defendant's parole status should be considered evidence of other crimes for purposes of Rule 404(b). *Cf. United States v. Hines,* 943 F.2d 348 (4th Cir.), *cert. denied,* 502 U.S. 993, 112 S.Ct. 613, 116 L.Ed.2d 635 (1991) ("revelations of the defendant's parole status might provoke a mistrial because it would inform the jury that the defendant had a prior criminal history").

■ The evidence in the record shows that the trial court considered Manarite's objections, including the prejudice issue, in

---

**17.** Manarite does not dispute that he was in fact on parole, or that he was fearful of police attention. *See Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) (Rule

404(b) evidence is relevant "if the jury can reasonably conclude that the act occurred and that the defendant was the actor").

its ruling. The court entertained counsel's arguments and granted defense motions to redact two portions of the tape recordings. " '[A] district court need not mechanically recite Rule 403's requirements before admitting evidence.' " *United States v. Ono*, 918 F.2d 1462, 1465 (9th Cir.1990) (quoting *United States v. Thomas*, 893 F.2d 1066, 1071 (9th Cir.), *cert. denied*, 498 U.S. 826, 111 S.Ct. 80, 112 L.Ed.2d 53 (1990)). Moreover, the trial court gave a limiting instruction to the jury. We find that the trial judge did not abuse his discretion in admitting the evidence regarding Manarite's parole status and his fear of law enforcement.

### F. Severance

▮▮▮ Jeanne Manarite contends that the trial court erred in not granting her motion to sever. Because she failed to renew her motion at the close of the evidence, however, she has waived the issue on appeal. *United States v. Restrepo*, 930 F.2d 705, 711 (9th Cir.1991); *United States v. Smith*, 893 F.2d 1573, 1581 (9th Cir.1990).

### G. Sentencing

#### 1. Failure to state reasons.

The trial court did not state its reasons for imposing the Manarites' sentences. Under 18 U.S.C. § 3553(c)(1), the court was required to make a "statement in open court of the reasons for choosing a sentence within the sentencing range if that range exceeds 24 months." *United States v. Upshaw*, 918 F.2d 789, 792 (9th Cir.1990), *cert. denied*, 499 U.S. 930, 111 S.Ct. 1335, 113 L.Ed.2d 266 (1991). The government concedes that this court must remand the case so that the judge may explain his reasons. *See id.* Accordingly, on remand the district court should make an adequate statement of reasons under § 3553(c)(1).

#### 2. Factual disputes about the presentence reports.

▮▮▮ The Manarites further contend that the district court failed to make findings about factual inaccuracies in their presentence reports, as required by Rule 32(c)(3)(D) of the Federal Rules of Criminal Procedure. The government argues that the Manarites' respective counsel withdrew their objections at the sentencing and therefore cannot raise them on appeal.[18] We find on the basis of the record that the Manarites waived their objections at the sentencing hearing. Accordingly, we decline to reach the merits.

#### 3. Criminal history points for prior felonies.

▮▮▮ Samuel Manarite argues that the trial court erred in assessing separate criminal history points for two prior felonies. He maintains that these felonies were "related" for purposes of U.S.S.G. § 4A1.2, and thus should have been assessed three criminal history points instead of six. His position is untenable.

Whether two cases are "related" under U.S.S.G. § 4A1.2 "is a mixed question of law and fact subject to *de novo* review." *United States v. Davis*, 922 F.2d 1385, 1388 (9th Cir.1991). Prior cases are considered to be related if they "(1) occurred on the same occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing." U.S.S.G. § 4A1.2(a)(2), Application Note 3.

The two prior felonies at issue were conspiracy to distribute obscene materials and extortion. Just before he was sentenced for the conspiracy charge, Manarite threatened one of his coconspirators for failing to repay a loan. The coconspirator told the FBI, which indicted Manarite for extortion. Manarite contends that the prior felonies were part of a common scheme or plan. The factors to be considered are

(1) whether the crimes were committed "within a short period of time;" (2) whether the crimes involved the same victim; (3) whether the defendant was arrested by the same law enforcement agency for both

---

18. If the defendant does not raise any objection to the presentence report at the time of sentencing, then she waives the right to challenge it on appeal. *United States v. Visman*, 919 F.2d 1390, 1394 (9th Cir.1990), *cert. denied*, 502 U.S. 969,

112 S.Ct. 442, 116 L.Ed.2d 460 (1991). The government argues, and we agree, that withdrawal of an objection is tantamount to a waiver of an issue for appeal. *United States v. Montoya*, 782 F.2d 1554, 1556 (11th Cir.1986).

crimes; ... (4) when the arrests occurred and whether both crimes were solved during the course of one investigation.... [and (5)] the similarities in the offenses. *United States v. Chapnick,* 963 F.2d 224 (9th Cir.1992) (quoting *Davis,* 922 F.2d at 1388).

We find that these two felonies were in no way part of a common scheme or plan. The loan was apparently unrelated to the obscene materials distribution ring. The two offenses are dissimilar in nature. The only possible nexus between them is that the coconspirator in one was the victim in the other. We affirm the trial court's assessment of separate criminal history points for the two crimes.

#### 4. *Leadership role.*

 Samuel Manarite next argues that the trial court erred in finding that he acted as a "leader" or a "manager" for purposes of U.S.S.G. § 3B1.1(c). This finding increased his Base Offense Level two levels. This court reviews the trial court's decision regarding the defendant's role in the offense for clear error. *United States v. Monroe,* 943 F.2d 1007, 1019 (9th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1585, 118 L.Ed.2d 304 (1992). Under this standard, Manarite cannot prevail. The district court's finding is well supported by the evidence in the record.[19]

### III.

#### *CONCLUSION*

We reverse the Manarites' convictions for conspiracy, vacate their sentences, and remand the case to the district court for resentencing to enable the district court to make a statement of reasons for its sentencing decisions as required by 18 U.S.C. § 3553(c)(1).

REVERSED in part and REMANDED.

---

**19.** The mere fact that the government agents may have played managerial roles in the criminal activity does not help Manarite. Under the Guidelines, "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, Application Note 4.